1  DANIEL ROBERT BARTLEY, CA Bar No. 79586
   BARTLEY LAW OFFICES
2  4040 Civic Center Drive, Suite 200
   San Rafael, CA  94903-4184
3  Telephone 415 898-4741  Fax 415 898-4841
   E-mail DanielBartleyLaw@aol.com
4
   Attorneys for Scott Driscoll, M.D., Relator
5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **EASTERN DISTRICT OF CALIFORNIA**

10  UNITED STATES OF              ) Case No. 1:11 cv 01776 LJO_SMS
    AMERICA, and STATE OF         )
11  CALIFORNIA, *ex rel.* SCOTT    ) **FIRST AMENDED COMPLAINT WITH DEMAND**
    H.M. DRISCOLL, M.D. and       ) **FOR JURY TRIAL**
12  SCOTT H.M. DRISCOLL,          )
    M.D., individually and        ) *[Filed under seal pursuant to 31 U.S.C. § 3730(b)(2)) and*
13  personally,                   ) *Cal. Gov C. § 12652(c)(2)]*
                                  )
14          Plaintiffs,           ) *Qui Tam* Causes of Action on behalf of United States:
                                  )
15  vs.                           )    1.  Knowingly Causing a False or Fraudulent Claim
                                  ) to Be Presented in Violation of the False Claims Act, 31
16  TODD SPENCER M.D.             ) USC. §3729(a)(1)(A)
    MEDICAL GROUP, INC.,          )
17  TODD SPENCER, M.D.,           )    2.  Knowingly Making, Using, or Causing to Be Made
    MADERA COMMUNITY              ) or Used, a False Record or Statement Material to a False or
18  HOSPITAL, and DOES 1          ) Fraudulent Claim, in Violation of 31 USC. §3729(a)(1)(B)
    through 100, Inclusive,       )
19                                )    3.  Conspiracy to Defraud the United States by Getting
            Defendants.           ) a False or Fraudulent Claim Allowed or Paid in Violation
20                                ) of 31 USC §3729(a)(1)(C)
                                  )
21                                ) *Qui Tam* Causes of Action on behalf of State of California:
                                  )
22                                )    4.  Knowingly Causing A False Claim to Be Presented,
                                  ) in Violation of Cal Gov C §12651(a)(1)
23                                )
                                  )    5.  Submission of a False Record to Obtain Payment of
24                                ) a False or Fraudulent Claim, in Violation of Cal Gov C.
                                  ) §12651(a)(2)
25                                )
                                  )    6.  Conspiracy to Defraud the State of California by
26                                ) Getting a False or Fraudulent Claim Allowed or Paid in
                                  ) Violation of Cal Gov C §12651(a)(3)
27                                )
                                  )    7.  Failure by Beneficiary of False Claim to Disclose
28                                ) False Claim to the State of California, in Violation of Cal
                                  ) Gov C §12651(a)(8)

Plaintiff and Relator, SCOTT H. M. DRISCOLL, M.D., "Relator", alleges:

**Introduction**

1.  (a) This is an action pursuant to the federal False Claims Act ("FCA") and the California False Claims Act ("CFCA") to recover damages and civil penalties on behalf of the United States of America for Medicare fraud and the State of California for Medi-Cal fraud. (b) This action is against a radiology group and one of four medical institutions at which the radiology group had contracts (the other two being prisons own and operated by the California Department of Corrections, and the other one being an institution that is in bankruptcy). (c) During the period December 1, 2007, to April 9, 2010, Relator observed that Defendants Todd Spencer, M.D. and Todd Spencer M.D. Medical Group, Inc. performed unnecessary radiology and CTscanning procedures, billed for procedures never attempted, and delivered medical reports and medical bills that clearly are inflated.  (d) The false claims relate to radiology and the modalities of mammography and CTscanning.  (e) The false claims proximately resulted in damages in the way of professional assessments by the SPENCER GROUP and damages in the way of technical assessments by the host institution.  (f) There was a direct causal connection between such billing fraud and Defendants' false certifications of compliance with applicable laws and regulations.  (g) The relevant period during which Relator alleges actionable FCA violations is a period beginning six years prior to the October 24, 2011, filing of the original Complaint forward.  (h) The relevant period during which Relator alleges actionable CFCA violations is a period beginning ten years prior to the filing date of the progoma; Complaint forward.  (i) Relator estimates over $52 million in unjustified charges by Defendants to federal and state taxpayers.

**The Seven Specific Schemes Alleged Herein by Relator**

2.  (a) In the Ninth Circuit, "it is sufficient to allege 'particular' details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *U.S. ex rel. Ebeid v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010). (b) As required by *Ebeid*, Relator provides particular details of *fully seven (7) specific schemes by Defendants to submit false claims*, paired with reliable indicia that lead to a strong inference that

claims were actually submitted.  (c) Without providing details about each false claim within such

seven schemes, Relator herein provides statistical and factual evidence that supports an inference

of fraud.  (d) Relator herein pleads sufficient detail to reasonably and fairly apprise Defendants of

the false  claims *schemes* of which Defendants are being accused.  (e) The seven specific

schemes pled by Relator within this Complaint are:

(i) At ¶ 27:   Unnecessary and useless CT scans, without contrast, of the abdomen and pelvis.

(ii) At ¶ 28:   Unnecessary unbundling of services, so as to charge more than if they were bundled.

(iii) At ¶ 29:   Unnecessary and useless CT scans of the chest, abdomen, and pelvis in instances in which the patient had already had a previous CT scan in-house or elsewhere.

(iv) At ¶ 30:   Unnecessary and useless CT angiography on soft tissues of the neck (thyroid gland, tongue, salivary glands, etc.), beyond the carotid arteries.

(v) At ¶ 31:   Unnecessary use of much more expensive and less effective CT scans rather than use of radiation-free ultrasound incident to draining abnormal fluid from the chest and abdomen via procedures known as "thoracentesis" and "paracentesis".

(vi) At ¶ 32:   Unnecessary use of CT scans incident to conducting pulmonary angiogram procedures.

(vii) At ¶¶ 34-36:

Unnecessary callbacks of mammography patients to undergo additional diagnostic procedures, at rates 500% of normal.

**Relator**

3.  (a) Relator SCOTT H. M. DRISCOLL, M.D. ("DRISCOLL", "DR. DRISCOLL", and "Relator") is a 74-year-old citizen of the United States of America, born in Chicago in 1939.  (b) Relator is a resident of Fresno, Fresno County, California.  (c) Relator is a physician with a subspecialty in radiology.  (d) Relator is licensed by the State of California to practice medicine.

(e) Relator is a Princeton graduate, with an AB degree.  (f) Also, Relator earned a master's degree at University of Pennsylvania before attending medical school.  (g) Relator graduated from Exeter, Princeton, and Northwestern University medical schools, with high honors in all. (h) Relator completed the requirements of internship, residency, and fellowship, in cardiovascular radiology and angiography at UCLA in Los Angeles.  (i) Relator practiced in cardiovascular radiology and angiography for the first part of his career, in both private practice and academia. (j) Relator was on the faculty at UCLA and Stanford University.  (k) Approximately one year after finishing his fellowship, The White House selected him to be the angiographer and radiologist to the President of the United States.  (l) Relator was the director of a large tandem cardiac cath lab in Southern California, following which he became the director of the department of radiology at a medium-size hospital.  (m) For nine years, from 1986 to 1995, Relator worked as a Director of Radiology at South Bay Community Hospital, at Redondo Beach, California.  (n) Also, Relator served Director of Radiology at Sierra Kings District Hospital for approximately four years, during the majority of his service there, from 2001 to 2005.  (o) From December 1, 2007, to April 9, 2010, Relator worked for the SPENCER GROUP, at Madera Community Hospital, in Fresno, California, where Relator was a diagnostic radiologist, doing virtually everything except for radiation therapy – C.T., MRI, ultrasound, general radiology, and interventional radiology, on an out-patient basis.

4.  (a) Relator, at all times alleged herein, was, and is, an original source, having direct and independent knowledge of the information on which the allegations herein are based. (b) Prior to filing this Complaint, Relator had firsthand knowledge of the alleged fraud, and he obtained such knowledge through his own labor unmediated by anything else.  (c) Relator complained on multiple occasions to DR. SPENCER about what was most probably the fraudulent practice of medicine, and DR. SPENCER in response screamed at Relator, denied such practice, and instructed Relator not to even mention the word "fraud."

**Defendants**

5.  (a) Defendant TODD D. SPENCER, M.D. ("SPENCER" and "DR. SPENCER") is an individual physician.  (b) DR. SPENCER, at all times set forth herein, has done business as

both an individual person and as the principal and president of the TODD SPENCER M.D. MEDICAL GROUP, INC. ("SPENCER GROUP"), his alter ego.  (c) According to DR. SPENCER'S website, his practice's address is Madera Community Hospital, 1250 East Almond Avenue, Madera, California 93637.  (d) A Florida native, DR. SPENCER graduated from Emory University Medical School in Atlanta.  (e) He did his training in radiology at Cook County Hospital, in Chicago.  (f) He then did his fellowship in interventional radiology at Johns Hopkins Hospital.  (g) He worked as an interventional radiologist at the St. Agnes Hospital in Fresno, California, until the Chief of Radiology terminated his employment due to excessive drug use and arriving to the hospital intoxicated in the morning.   (h) He relocated to Madera, California, where he was required to take anger management seminars and to participate in a drug rehabili-tation program.

6. (a) Defendant MADERA COMMUNITY HOSPITAL ("MCH") is a hospital established in the State of California in 1971 as a California not-for-profit corporation exempt under IRS code 501c(3).  (b) MCH's address is 1250 East Almond Avenue, Madera, Madera County, California 93637.  (c) MCH is a freestanding, community-based organization and is not associated with any other hospital or health system.  (d) The hospital contains 106 acute care beds, a 16-bed Emergency Department and a 10-bed Intensive Care Unit.  (e) MCH also operates two rural health care clinics and a home health agency.  (f) MCH is named a Defendant only as to liability for damages arising from the SPENCER GROUP at MCH.

7. (a) Relative to all counts, Relator sues fictitious Defendants Does 1 through 100, inclusive, because their names, and/or capacities, and/or facts showing them liable are not known presently. (b) Relator is unaware of the true names and capacities of the Defendants sued as Does 1 through 100.  (c) Relator will amend his complaint when the true names and capacities have been ascertained.  (d) Each Doe Defendant is responsible in some actionable manner for the events, occurrences, injuries and damages alleged herein.

8.  The terms "Defendants" will refer collectively to the aforesaid Defendants acting by and through their managerial employees, and each of them.

\\\

9.   Managerial employees of each the Defendants, in doing the acts and things described in this complaint, were acting within the course and scope of their respective agencies and/or employment with their particular Defendant employer, with the knowledge and consent of such Defendant, and each of them, unless otherwise indicated.

10.   (a) Each of the Defendants agreed and conspired with one another to engage in the acts alleged herein, and each such co-conspirator committed the acts alleged herein in furtherance of their conspiracy. (b) In so doing, Defendants violated Cal. Penal C. § 182(a)(1), which prohibits a conspiracy between two or more persons to commit any crime; Cal. Penal C. §182(a)(4), which prohibits conspiracies to obtain money or property by false pretenses; and Cal. Penal C. § 182(a)(5), which prohibits conspiracies to commit "any act injurious to the public health."

## Jurisdiction and Venue

11.   (a) This is an action brought pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729, et seq., and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331.

12.   This case arises from the wrongful conduct of the Defendants incident to the unlawful use of funds of the United States of America and the State of California.

13.   This Court has in personam jurisdiction over the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process.

14.   (a) 31 U.S.C. § 3732(a) provides:  "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in which any proscribed by section 3729 occurred."  (b) Venue is proper in the Eastern District of California because most of the alleged conduct occurred within the boundaries of the Eastern District.

15.   This Court has supplemental jurisdiction over Relator's individual and personal claims of retaliation, wrongful termination, and unpaid wages.

## GENERAL ALLEGATIONS

### FCA Liability for Reimbursement Requests for Medically Unnecessary Purposes

16.   (a) Submitting a request for Medicare reimbursement for medically unnecessary purposes is a false claim under section 3729(a)(1)(A), because Medicare laws prohibit payment

1   for items and services not reasonable and necessary.  14 U.S.C. 13956(a)(1)(A).  (b) A statement

2   or record, such as an invoice, is not required to establish a violation of 3729(a)(1)(A).  (c) A

3   policy, practice, or course of conduct to fraudulently induce the Government to part with its

4   money may establish inflated false claims.  (d) A defendant submitting a Medicare reimburse-

5   ment form implicitly certifies compliance with the statute prohibiting Medicare payments for

6   services that are not reasonable and necessary.

7           17.  (a) The Center for Medicare and Medicaid Services ("CMMS"), a branch of the

8   U.S. Department of Health and Human Services, is the federal agency that administers the

9   Medicare program and that monitors the Medicaid programs offered by each state.  (b) CMS is

10  responsible to make both coverage and medical necessity determinations, and may issue a

11  National Coverage Determination ("NCD").  (c) If no NCD has been issued, or if an NCD

12  requires further clarification, Medicare carriers and intermediaries may develop a local coverage

13  determination ("LCD").  (d) The NCD for Computed Tomography indicates that the contractor's

14  medical staff may determine that use of a CT scan as the initial diagnostic test was not reasonable

15  and necessary when it was not supported by the patient's symptoms or complaints stated on the

16  claim form.  (e) Claims for CT scans are reviewed for evidence of abuse, which might include

17  the absence of reasonable indications for the scans, an excessive number of scans, or unneces-

18  sarily expensive types of scans, considering the facts in the particular cases.  (f) The NCD for

19  Mammograms indicates that a radiological mammogram is a covered diagnostic test when a

20  patient has distinct signs and symptoms for which a mammogram is indicated, when a patient has

21  breast cancer, or when a patient is asymptomatic, but, on the basis of history and other factors

22  that the physician deems significant, the physician's judgment is that a mammogram is appropri-

23  ate.  (g) DR. SPENCER and his SPENCER GROUP submitted false Medicare claims, where

24  there is substantial evidence of medically unnecessary services under his protocol, for example

25  the standard by NCDs and LCDs, Medicare pamphlets and newsletters that collectively explained

26  requirements and codes, documents such as referral requests and consultation reports, the

27  doctor's own testimony, Current Procedural Terminology ("CPT") Manual definitions, and

28  descriptions provided by government witnesses.

1    18. (a) There is an indelible record of each institution's Department of Radiology's

2    "protocol" (instructions of what to do and how to do it) available in DR. SPENCER'S billing

3    office, in the Department of Radiology, and at each x-ray technician's station.  (b) A "protocol" in

4    radiology by represents instructions to the x-ray technologists for all examinations by telling

5    them what to do  and how to do it.  (c) Such protocol is usually designed by a small ad hoc

6    committee in radiology consisting of radiologists and several technologists as well as the chief

7    technologist.  (d) At MCH, only one radiologist sits on the committee, the chief of radiology.

8    (e) After several repeat examinations, the technologist no longer relies on the "protocol," but for

9    an occasional exotic exam will refer to those written instructions.

10                                    **CFCA Liability**

11    19. (a) The California Department of Health Care Services ("DHCS") (formerly the

12    California Department of Health Services or "DHS") enacts regulations for California's Medicaid

13    program, known as "Medi-Cal." As participating Medi-Cal providers, Defendants were and are

14    subject to DHSC regulations that require them to provide services to Medi-Cal patients at their

15    most favorable rates. California Code of Regulations, Title 22, Section 51501, subdivision (a),

16    requires as follows: no provider shall charge for any service or any article more than would have

17    been charged for the ***same service*** or article to ***other purchasers of comparable services or***

18    ***articles under comparable circumstances.***  (Emphasis added.)  (b) The primary statute targeted

19    at Medi-Cal fraud is Cal.  Welfare & Institutions C. § 14107, which prohibits presenting a false

20    or fraudulent claim for furnishing services or merchandise, with intent to defraud, knowingly

21    submitting false information for hte purpose of obtaining greater compensation than that to

22    which one is legally entitled for services or merchandise, knowingly submitting false information

23    for the purpose of obtaining authorization for furnishing services or merchandise, and knowingly

24    and wilfully executing or attempting to execute a scheme or artifice to defraud the Medi-Cal

25    program or to obtain Medi-Cal money or property by false statements or fraud.  (c) In addition,

26    false claims for health care benefits and a variety of related conduct are prohibited by Cal. Penal

27    C. § 550(a), which specifically prohibits, inter alia, knowingly making or causing to be made a

28    false or fraudulent claim for payment of a health care benefit.  (d) In addition, false claims for

1    healthcare benefits are prohibited by Cal. Penal C. § 487, which prohibits grand theft and of Cal.

2    Penal C. §§ 484 and 532, which prohibit one from knowingly and designedly, by any false or

3    fraudulent representation or pretense, defrauding any person of money or property.  (e) Defen-

4    dants, via their conduct set forth herein, violated Cal. Welfare & Institutions C. § 14107, Cal.

5    Penal C. §§ 484, 487, 532, and 550(a).

6         20.  Defendants' Medi-Cal Provider Agreements also made clear their duty, consistent

7    with the program's public purposes, to charge their lowest fees to DHCS and refrain from

8    conduct that would harm the Medi-Cal program or its beneficiaries. Among other commitments,

9    Defendants agreed to do all the following:

> **Compliance with Laws and Regulations**. Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHS pursuant to these chapters. . . .

> **Forbidden Conduct.** Provider agrees that it shall not engage in conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or the fiscal integrity of the Medi-Cal program.

> **Provider Fraud and Abuse.** Provider agrees that it shall not engage in fraud or abuse. . . .

> **Prohibition of Rebate, Refund or Discount.** Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission, preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. Provider further agrees that it shall not solicit, request, accept, or receive, any rebate, refund, commission, preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. Provider further agrees that it shall not take any other action or receive any other benefit prohibited by state or federal law.

### Required Certification by FDA

21.  (a) The State of California, as a condition of receiving State of California Medi-Cal funding for mammographies, requires that qualifying institutions be certified by the FDA.

### Claims in Violation of FCA and CFCA

22.   (a) Defendants presented, or caused to be presented, false and fraudulent claims to the U.S. and the State of California for approval for payment.  (b) DR. SPENCER and the

1   SPENCER GROUP instructed the staff of the four affected medical institutions, through the

2   SPENCER "protocol," to perform unnecessary mammography and unnecessary CT scanning, and

3   to prepare reports for inflated billings.

4          23.   (a) Each of such claims for payments was, and is, a "claim" under the FCA. (*See*

5   *U.S. ex rel. Aflatooni v. Kitsap Physicians Services*, 163 F.3d 519 (9th Cir. 1999).)  (b) Defen-

6   dants' submission of false claims for reimbursement for medically unnecessary procedures,

7   under Medicare and other federally organized health programs, constituted a false claim under

8   the FCA.  (*See U.S. ex rel. Lowman v. Hilton Head Health System L.P.*, 487 F.Supp.2d 682

9   (D.S.C. 2007).)  (c) A statement or record, such as an invoice from SPENCER GROUP or from

10  one of the four affected institutions, is not required to establish a violation of the FCA. (*See U.S.*

11  *ex rel. Fallon v. Accudyne Corp.*, 921 F.Supp. 611, 627 (W.D. Wis. 1995).) (d) The policy,

12  practice, and course of conduct by Defendants to fraudulently induce the Government to part

13  with its money established inflated false claims.  (*See U.S. v. Incorporated Village of Island*

14  *Park*, 888 F.Supp. 419 (E.D. N.Y. 1995).)  (e) In February 17, 2011, the United States

15  Department of Health and Human Services announced that Medicare fraud cases charged to the

16  Medicare Fraud Task Force include cases related to diagnostic testing. (*See* U.S. Dept. of Health

17  and Human Services, *Medicare Fraud Task Force Charges 111 Individuals for More than $225*

18  *Million in False Billing and Expands Operations to Two Additional Cities*, Feb. 17, 2011, at

19  http://www.hhs.gov/news/press/2011pres/02/20110217a.html.)  (f) Defendants devised or

20  intended to devise a scheme to defraud (or to perform specified fraudulent acts), and use of the

21  mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent

22  acts), in violation of the federal mail fraud statute, 18 U.S.C. § 1341, in violation of the

23  California general fraud statute, Cal. Welfare & Institutions C. § 14107, and in violation of Cal.

24  Penal C. § 550(a).

**Locations Where False Claims Occurred**

26         24.   Defendants DR. SPENCER and the SPENCER GROUP were providing radiology

27  services at four different institutions during the following periods: (a) Madera Community

28  Hospital – approximately 1997 to present; (b) Sierra Kings District Hospital – early March 2005

1   to August 1, 2010; (c) Valley State Prison for Women ("VSPW") – at least from 2002 to present;

2   and (d) Central California Women's Facility ("CCWF") – at least from 2002 to present.

3           25.  (a) VSPW is a female-only prison owned and operated by the State of California

4   Department of Corrections and Rehabilitation.  (b) VSPW's address is 21633 Avenue 24,

5   Chowchilla, California 93610.  (c) VSPW's operations include provision of medical care to

6   inmates.  (d) VSPW opened in April, 1995.  (e) As of September 2010, VSPW had a design

7   capacity of 1,980 but a total institution population of 3,561, for an occupancy rate of 180 percent.

8   (f) VSPW is one of the locations where the SPENCER GROUP engaged in the conduct made the

9   subject of Relator's qui tam claims.  (g) Because VSPW is a state-owned entity, exempt from

10  liability under the FCA and the CFCA, Relator makes no claim against VSPW.

11          26.  (a) CCWF is a female-only prison owned and operated by the State of California

12  Department of Corrections and Rehabilitation. (b) CCWF's address is 23370 Road 22,

13  Chowchilla, California 93610, directly across from VSPW. (c) CCWF is the largest female

14  correctional facility in the United States. (d) CCWF houses the State of California's death row

15  for women. (e) CCWF's operations include provision of medical care to inmates. (f) CCWF is

16  one of the locations where the SPENCER GROUP engaged in the conduct made the subject of

17  Relator's qui tam claims. (g) Because CCWF is a state-owned entity, exempt from liability under

18  the FCA and the CFCA, Relator makes no claim against CCWF.

19                  **Representative Examples Illustrative of the Class**

20                  **of All Claims Covered by Defendants' Fraudulent Schemes**

21          27.  (a) DR. SPENCER and the SPENCER GROUP, during the periods in question,

22  routinely performed unnecessary and useless CT scans of the abdomen and pelvis, without

23  contrast (radiopaque dye), notwithstanding that medical scholars have long concluded that there

24  is no useful information without contrast.  (b) The only patients for whom SPENCER GROUP

25  properly did CT scans without contrast were patients with kidney stones and allergies.  (c) On

26  December 14, 2007, DR. DRISCOLL personally observed that scores of CTexams of the

27  abdomen and the pelvis, from the two prisons (CCWF and VSPW), all included CT without I.V.

28  contrast – a sequence that has no medical value, contains excessive and unnecessary radiation,

and is very expensive.  (d) Because these deficiencies had been discussed extensively in the medical literature, DR. DRISCOLL instructed Ms Leslie Espinola, R.T., Chief x-ray technologist at the Chowchilla prisons (CCWF and VSPW), to delete this unnecessary imaging sequence from future studies.  (e) In response, DR. SPENCER within minutes telephoned DR. DRISCOLL and commanded, "Don't alter my protocols! And don't *ever* do this again!"  (f) DR. SPENCER made no attempt to address the medical, scientific, or financial aspects of his decision.

28.   (a) In December, 2009, a CT angiogram of the lower extremities of an older man was performed because of suspected PAD (peripheral artery disease).  (b) Relator personally read this study and personally submitted it to Medical Records at MCH.  (c) Mr. Forrest Berry, a Medical Transcriber in MCH Medical Records, and DR. SPENCER'S "inside man," three times in a row returned the study to Relator, with a demand that Relator dictate findings on "the other four studies."  (d) Yet, there was only one study, and it would be fiction to maintain that there were five.  (e) This was an example of "unbundling" – *i.e.*, breaking a procedure into its component parts and billing for the many instead of the one.  (f) Such "unbundling" is prohibited by MediCare and Medi-Cal.  (g) Because there was only one study and not five, Relator contacted Mr. Berry and declared "What's going on? Is this fraud?"  (h) Several minutes later, DR. SPENCER angrily pulled Relator into his office and declared, "Don't you *ever, ever,* again use that word 'fraud' in this department or in this hospital!  And don't *ever* let the administrators down the hall hear you say that!"  (i) Such unbundling occurred in approximately 10% of the cases handled by the SPENCER GROUP.

29.   (a) Defendants, during the periods in question, routinely performed unnecessary and useless CT scans of the chest, abdomen and pelvis incident to percutaneous biopsy of the chest, abdomen, and pelvis.  (b) The patient in each such circumstance had always had a previous CT scan in-house or elsewhere.  (c) All that the percutaneous biopsies required are three or four slices through the "mass" in the chest or liver to judge whre to insert the needle, how deep, what angle, etc.  (d) It is not necessary to repeat a diagnostic CT from the neck to the pubis.  (e) These unnecessary CT slices have no diagnostic usefulness, they create excessive radiation, and they are very expensive.

30.   (a) Defendants, during the periods in question, routinely performed unnecessary and useless CT angiography.  (b) In addition to doing a CT of the carotid arteries, Defendants routinely did an additional CT of the soft tissues of the neck.  (c) Yet, there is no value in learning the anatomy of the thyroid gland, tongue, salivary glands, etc. when the clinical problem is stroke, temporary stroke, or bruit (murmur).  (d) Defendants – both the hospital and the radiologist – routinely sent excessive charges.  (e) Even though the physician had never ordered CT scanning of the neck, such routinely was performed because of the SPENCER GROUP'S "protocol."

31.   (a) Defendants, during the periods in question, routinely made unnecessary use of CT scans incident to draining abnormal fluid from the chest and abdomen via procedures known as "thoracentesis" and "paracentesis."  (b) Fully 98.5% of physicians in the U.S. perform thoracentesis and paracentesis under ultrasound control rather than CT control.  (c) Yet, at MCH, Dr. SPENCER performed this procedure exclusively under CT control.  (d) This method is not as effective, cannot use gravity to assist, is slower, costs thousands of dollars as opposed to hundreds of dollars, and generates radiation exposure whereas ultrasound has none.  (e) The decision to use CT instead of ultrasound represented poor judgment and fraud.

32.   Defendants, during the periods in question, routinely made unnecessary use of CT scans incident to conducting pulmonary angiogram procedures.

**Mammography Quality Standards Act**

33.   (a) The U.S. Food and Drug Administration ("FDA"), as a condition of receiving federal funding, requires that qualifying institutions keep annual mammography statistics, pursuant to the Mammography Quality Standards Act ("MQSA"), 42 U.S.C. § 263(b).  (b) From October 1, 1994, forward, a certificate issued by the FDA is required for lawful operation of all mammography facilities under the regulatory jurisdiction of the United States, with the exception of the Department of Veterans Affairs.  (c) To obtain a certificate from the FDA, facilities are required to meet the quality standards in 21 C.F.R. Part 900 et seq. and to be accredited by an approved accreditation body or other entity as designated by FDA.  (d) FDA's MQSA was enacted to ensure that all women have access to quality mammography imaging services and

breast care.  (e) Facilities must become accredited and then certified in order to perform mammography services lawfully. (f) Once certified, facilities must undergo periodic reviews of their clinical images, have an annual survey by a medical physicist, and meet federal quality standards regarding personnel qualifications, equipment, radiation dose, quality assurance programs, and record keeping and reporting.  (g) Facilities at least every three years must also undergo an inspection of their mammography practices, conducted by a federally certified inspector.

### Mammography Call-backs

34.   (a) Defendants, during the periods in question, routinely called back mammography patients to undergo additional diagnostic procedures because of suspicious findings. (b) In mammography, the U.S. Food and Drug Administration ("FDA") requires that statistics be kept on an annual basis, reflecting the percentage of callback statistics per year per radiologist on patients who return for additional procedures because of suspicious findings.  (c) The callback norm is 10% per year or less.  (d) On November 17, 2009, an MCH medical staff peer review quality assurance committee discovered that two radiologists working for SPENCER GROUP had numbers of 47% and 54% – 500% above normal.  (e) This problem was extensively discussed on two occasions in medical staff quality assurance committee meetings in November 2009 and January 2010, and ultimately was referred to the medical executive committee for investigation or discipline.  (f) *On information and belief, in response to disciplinary measures, including probation, taken by the MCH medical executive committee, Defendants in the first quarter of 2010 began addressing the issue of fraudulent mammography call-backs; accordingly Defendants' fraudulent mammography call-backs complained of herein relate primarily to years 2001 through 2009.  (g) In late 2009, SPENCER lost his mammography privileges at MCH.*

35.   (a) Surgical statistics in the U.S. for breast biopsy reveal a positive rate of malignancy of 20%.  (b) In order to justify a call-back ratio of 54%, the positive rate of breast biopsy would have to climb to 98-99% – 500% above existing numbers.  (c) When DR. DRISCOLL in such time frame raised this anomaly with DR. SPENCER, he responded, "This information is trivial and irrelevant! Don't bother me!"  (d) Subsequently, the medical staff

executive committee imposed remedial action on the chief of radiology.  (e) Simultaneously, DR. SPENCER'S privileges in mammography were revoked because of failure to meet educational standards mandated by the FDA.

36.    (a) Patti Duran, R.T., performed all the mammograms that were performed at MCH.  (b) She is the Director of Mammography on the technical side at MCH. (c) She witnessed the mammography call-backs, where DR. SPENCER routinely sent patients back for more work nowithstanding normal examinations.  (d) She witnessed the ridiculous number of recalls by DR. SPENCER.  (e) She also witnessed at least one of DR. SPENCER'S incidents of rage, which she described as "frightening".

**False Certification of Compliance with Applicable Laws and Regulations**

37.    Using Federal and State shared Medi-Cal revenues, the Defendants falsely and fraudulently certified compliance with MQSA and other applicable laws and regulations.

**Damages to Taxpayers**

38.    Relator claims damages to taxpayers, before trebling and before imposing statutory penalties, as follows:

(a) MCH: $21 million technical charges by MCH and $7 million professional charges by SPENCER GROUP, roughly two-thirds of which was to MediCare and one-third of which was to Medi-Cal;

(b) SKDH: $6 million technical charges by SKDH and $2 million professional charges by SPENCER GROUP, roughly two-thirds of which was to MediCare and one-third of which was to Medi-Cal;

(c) CCWF: $6 million technical charges by CCWF and $2 million professional charges by SPENCER GROUP, roughly one-third of which was to MediCare and roughly two-thirds to Medi-Cal;

(d) VSPW:  $6 million technical charges by VSPW and $2 million professional charges by SPENCER GROUP, roughly one-third of which was to MediCare and roughly two-thirds to Medi-Cal.

\\\

1    39.   Though no liability lies with CCWF and VSPW for the technical charges made by

2    them, due to their being State of California entities, Relator does claim that DR. SPENCER and

3    the SPENCER GROUP are liable to the United States for such technical charges.

4    **Additional Details Regarding "Who, What, When, Where and How"**

5    40.   (a) DR. SPENCER, his billing office, and the MCH billing office (the MCH billing

6    manager and the MCH patient accounts manager) were the persons directly responsible for the

7    fraudulent activity.  (b) Relator was given no access to the billing offices or medical records

8    department; if Relator had pursued data, he would have been in jeopardy with discipline or

9    termination.  (c) The "what" are the thousands of x-ray examinations interpreted by DR.

10   SPENCER and performed from the "protocol" designed by Spencer.  (d) The "when" are the

11   thousands of x-ray examinations performed between December 1,  2007, and April 9, 2010.

12   (e) The "where" are the MCH Department of Radiology, as well as the Sierra Kings District

13   Hospital, CCWF, and VSPW departments and billing offices.  (f) The "how" is the x-ray

14   technologists' compliant responses in each instance to DR. SPENCER'S "protocol", doing exactly

15   as they were ordered.  (g) Spencer's unnecessary mammographic "callbacks" during the period in

16   question were 500% beyond recommendations of the FDA and university authors of medical

17   literature.  (h) This fraudulent means of self-referral by SPENCER was investigated by three and

18   one-half (3½) peer review committees, which peer review resulted in discipline for SPENCER,

19   amounting to punishment with conditions and probation in mammography for one year.  (i) The

20   peer review committees required SPENCER to move his mammography statistics to normal

21   range (10% or less for "recalls") and to read enough daily extra mammograms to improve his

22   skills and judgment.   (j) This peer reviewed discipline forms the initial portion of this *qui tam*

23   action.  (k) SPENCER'S practice of doing CT scanning of the abdomen without contrast forms a

24   portion of this *qui tam* action; only patients with urinary tract stones, allergy to contrast, and

25   subtle evidence of hepatic metastasis need CT without contrast; it has been shown and

26   recommended by academic authors that CT without contract should not be routine in patients

27   because it has no useful medical information, generates harmful radiation, and is expensive;

28   therefore it should not be done; however, by "protocol," SPENCER, during the period in

1   question, was doing this in all his CT abdominal patients.  (l) CT localization of tumors in the

2   chest, abdomen, and pelvis are provided by 3 or 4 localizing CT slices, a complete diagnostic run

3   having been previously obtained in-house or elsewhere; SPENCER however by "protocol" then

4   performed a diagnostic run from neck to pubis of no use to any of the attending physicians,

5   expensive and a radiation hazard.  (m) CT angiography of the carotid arteries, the pulmonary

6   arteries, and the runoff arteries is a major step forward in 21st century imaging; however,

7   SPENCER would routinely include a CT scan of the soft tissues of the neck for no medical

8   benefit, and include additional views of the pulmonary arteries, and make fraudulent demands for

9   extra reports of the lower extremity runoffs (unbundling) through his medical transcriber (Forest

10  Berry).  (n) Thoracentesis/Paracentesis is routinely performed under ultrasound; however,

11  SPENCER during the period in question always performed these under CT, which is not as

12  efficient, takes longer, delivers large quanta of x-radiation, and is very expensive – *i.e.*, thousands

13  of dollars vs. hundreds of dollars; this was fraud.  (o) All x-ray reports by a radiologist generate a

14  bill to the patient or insurance company by the radiology billing office and the hospital patient

15  billing office; each report during the period in question was the gateway to fraud; it is incompre-

16  hensible how the hospital leadership in each and every instance could have been unconscious to

17  this fraud for more than a decade.

**Pre-Filing Confidential Disclosure by Relator**

18

19      41.  Prior to filing his complaint, Relator DR. DRISCOLL, in compliance with the FCA

20  and the CFCA, confidentially disclosed underlying facts to the United States Department of

21  Justice and to the State of California Office of Attorney General.

22

**FIRST CAUSE OF ACTION:**

23

**KNOWINGLY CAUSED A FALSE OR FRAUDULENT CLAIM**
**TO BE PRESENTED IN VIOLATION OF THE FALSE CLAIMS ACT,**
**31 U.S.C. § 3729(a)(1)(A), AGAINST ALL DEFENDANTS**

24

25

26      42. Relator re-alleges, and fully incorporates herein by reference, paragraphs 1-41

27  above.

28  \\\

43.  In performing the acts particularly set forth above, Defendants TODD SPENCER, M.D., TODD SPENCER M.D. MEDICAL GROUP, INC., and MADERA COMMUNITY HOSPITAL defrauded the United States of America, by knowingly presenting, or causing to be presented, to one or more officers or employees of the United States of America, a false and fraudulent claim for approval or payment for Medi-Cal, with an implied certification of compli-ance with all Federal eligibility laws, in contravention of the Federal False Claims Act (31 U.S.C. § 3729(a)(1)(A)), to the damage of the treasury of the United States of America, by causing the United States to pay out money it is not obligated to pay.

44.  (a) As a direct and proximate result of such false and fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(A), there were at least 34,500 instances of which were unnecessary. (b) There were at least 34,500 instances in which federal MediCare funds were so expended for work by Defendants at MCH, and there were at least 29,000 examination instances in which federal MediCare funds were expended for work by Defendants Sierra Kings District Hospital. (c) Each and every one of these instances constituted a separate false or fraudulent claim to the United States Treasury.  (d) Aside from the per-incident penalties, and before trebling, the amount of damages so sustained by the United States is in excess of $26 million.

**SECOND CAUSE OF ACTION:**

**KNOWINGLY MADE, USED, OR CAUSED TO BE MADE OR USED,**
**A FALSE RECORD OR STATEMENT MATERIAL TO A FALSE OR**
**FRAUDULENT CLAIM, IN VIOLATION OF THE FEDERAL**
**FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B)**
**AGAINST ALL DEFENDANTS**

45.  Relator re-alleges, and fully incorporates herein by reference, paragraphs 1-41.

46.  By virtue of the particular acts described above, Defendants TODD SPENCER, M.D., TODD SPENCER M.D. MEDICAL GROUP, INC., and MADERA COMMUNITY HOSPITAL knowingly made, used, or caused to made or used a false or fraudulent record or a false or fraudulent statement material to getting a false or fraudulent claim paid or approved by the United States of America, in contravention of the Federal False Claims Act (31 U.S.C. §

\\\

3729(a)(1)(B)) to the damage of the Treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

47.  (a) As a direct and  proximate result of such false claims in violation of 31 U.S.C. § 3729(a)(1)(B), which expenditures were unreasonable, inappropriate, and unnecessary.  (b) There were at least 34,500 instances in which federal MediCare funds were so expended for work by Defendants at MCH, and there were at least 29,000 examination instances in which federal MediCare funds were expended for work by Sierra Kings District Hospital.  (c) Each and every one of these instances constituted a separate false or fraudulent claim to the United States Treasury.  (d) Aside from the per-incident penalties, and before trebling, the amount of damages so sustained by the United States is in excess of $26 million, as broken down above.

### THIRD CAUSE OF ACTION:

**CONSPIRACY TO DEFRAUD THE UNITED STATES BY GETTING A FALSE OR FRAUDULENT CLAIM ALLOWED OR PAID IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(C), AGAINST ALL DEFENDANTS**

48.  Relator re-alleges, and fully incorporates herein by reference, paragraphs 1-41.

49.  By performing the particular acts set forth above, Defendant hospital MADERA COMMUNITY HOSPITAL separately conspired with Defendants TODD SPENCER, M.D., and TODD SPENCER M.D. MEDICAL GROUP, INC. to get false and fraudulent claims allowed and paid by the United States.

50.  (a) As a direct and proximate result of such conspiracy in violation of 31 U.S.C. § 3729(a)(1)(C), there were damages to the United States Treasury as set forth above.  (b) There were at least 34,500 instances in which MediCare funds were so expended for work by Defen-dants at MCH, and there were at least 29,000 examination instances in which MediCare funds were expended for work by SKDH, which expenditures were unreasonable, inappropriate, and unnecessary.  (c) Each and every one of the instances of unbundling, overbilling, and ordering unnecessary procedures constituted a separate false claim to the United States.  (d) Aside from per-incident penalties, and before trebling, the amount of damages so sustained by the United States is in excess of $26 million for such period, as broken down above.

**FOURTH CAUSE OF ACTION:**

**KNOWINGLY CAUSING A FALSE CLAIM TO BE PRESENTED IN VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT, CAL. GOV. C. § 12651(a)(1), AGAINST ALL DEFENDANTS**

51.  Relator re-alleges, and fully incorporates herein by reference, paragraphs 1-41.

52.  By virtue of the acts particularly described above, Defendants TODD SPENCER, M.D., TODD SPENCER M.D. MEDICAL GROUP, INC., and MADERA COMMUNITY HOSPITAL have knowingly made, used, or caused to be made or used, a false claim to get a false or fraudulent claim paid or approved by the State of California, in contravention of the California False Claims Act (Cal. Gov. C. § 12651(a)(1)), to the damage of the State of California, by causing it to pay out money it was not obligated to pay.

53.  (a) As a direct and proximate result of such false claims in violation of Cal. Gov. C. § 12651(a)(1), there were at least 34,500 instances in which State of California funds were so expended for work by Defendants at MCH, and there were at least 29,000 examination instances in which State of California funds were expended for work by Sierra Kings District Hospital, which expenditures were unreasonable, inappropriate, and unnecessary.  (b) Each and every one of these instances constituted a separate false or fraudulent claim to the State of California treasury.  (c) Aside from per-incident penalties, and before trebling, the amount of damages so sustained by the State of California is in excess of $26 million for such period, as broken down above.

**FIFTH CAUSE OF ACTION:**

**KNOWING SUBMISSION OF FALSE RECORD TO OBTAIN PAYMENT OF A FALSE OR FRAUDULENT CLAIM IN VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT, CAL. GOV. C. § 12651(a)(2), AGAINST ALL DEFENDANTS**

54.  Relator re-alleges, and fully incorporates herein by reference, paragraphs 1-41.

55.  By virtue of the acts particularly described above, Defendants TODD SPENCER, M.D., TODD SPENCER M.D. MEDICAL GROUP, INC., and MADERA COMMUNITY HOSPITAL have knowingly made, used, or caused to be made or used a false record or statement to get a false claim paid or approved by the State of California, in contravention of the California

False Claims Act (Cal. Gov C. § 12651(a)(2)), to the damage of the Treasury of the State of California, by causing it to pay out money it was not obligated to pay.

56.  (a) As a direct and proximate result of such false claims in violation of Cal. Gov C. § 12651(a)(2), there were at least 34,500 instances in which State of California funds were so expended for work by Defendants at MCH, and there were at least 29,000 examination instances in which State of California funds were expended for work by Sierra Kings District Hospital.  (b) Each and every one of these instances constituted a separate false or fraudulent claim to the State of California treasury.  (c) Aside from per-incident penalties, and before trebling, the amount of damages so sustained by the State of California is in excess of $26 million for such period, as broken down above.

### SIXTH CAUSE OF ACTION:

**CONSPIRACY TO DEFRAUD THE STATE OF CALIFORNIA BY GETTING A FALSE OR FRAUDULENT CLAIM ALLOWED OR PAID IN VIOLATION OF CAL. GOV. CODE § 12651(a)(3), AGAINST ALL DEFENDANTS**

57.  Relator re-alleges, and fully incorporates herein by reference, paragraphs 1-41.

58.  Defendant MADERA COMMUNITY HOSPITAL separately conspired with the Defendants TODD SPENCER, M.D., and TODD SPENCER M.D. MEDICAL GROUP, INC. to get the above-referenced false and fraudulent claims allowed and paid by the State of California.

59.  (a) As a direct and proximate result of each such conspiracy, the State of California sustained damages, in the nature of State of California funds expended for unnecessary proce-dures, improperly bundled procedures, and over-billed procedures.  (b) There were at least 34,500 instances in which State of California funds were so expended for work by Defendants at MCH, and there were at least 29,000 examination instances in which State of California funds were expended for work by Defendants Sierra Kings District Hospital.  (c) Each and every one of these instances constituted a separate false or fraudulent claim to the State of California. (d) Aside from per-incident penalties, and before trebling, the amount of damages so sustained by the State of California is in excess of $26 million for the subject period, as broken down above.

\\\

**SEVENTH CAUSE OF ACTION:**

**FAILURE OF BENEFICIARIES OF FALSE CLAIMS TO DISCLOSE
FALSE CLAIMS, IN VIOLATION OF CAL. GOV. CODE
§ 12651(a)(8), AGAINST ALL DEFENDANTS**

60.  Relator re-alleges, and fully incorporates herein by reference, paragraphs 1-41.

61.  If, notwithstanding the facts alleged above, the finder of fact determines that any Defendant's submission of the above-referenced false claims to the State of California was inadvertent, rather than knowing, the California False Claims Act, at Cal. Gov. C. § 12651(a)(8), imposes liability upon the beneficiary of an inadvertent submission of a false claim to the state or political subdivision, where such beneficiary subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

62.  In such circumstance, Defendants DR. SPENCER, SPENCER GROUP, and MADERA COMMUNITY HOSPITAL, respectively, each discovered the falsity of the subject claims, yet failed to disclose such falsity to the State of California within a reasonable time after discovery.

63.  (a) As a direct and proximate result of the subject Defendants' failure to disclose to the State of California the Defendants' false claims, the State of California sustained damages, in the nature of State of California funds expended.  (b) During the applicable time period, there were at least 34,500 examination instances in which State of California funds were expended for SPENCER GROUP radiology services at MADERA COMMUNITY HOSPITAL, and there were at least 29,000 examination instances in which State of California funds were expended for Sierra Kings District Hospital.  (c) Each and every one of these instances constituted a separate false or fraudulent claim to the State of California.  (d) Aside from per-incident penalties, and before trebling, the amount of damages so sustained by the State of California is in excess of $26 million for the subject period, as broken down above.

\\\

\\\

\\\

**PRAYER FOR RELIEF**

WHEREFORE, Relator requests the following relief:

1. Judgment in favor of the United States against all Defendants, by reason of the viola-tions of the False Claims Act as set forth above, in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a statutory civil penalty of not less than Six Thousand Dollars ($6,000) for each false claim, plus three times the amount of damages which the United States has sustained, pursuant to 31 U.S.C. § 3729(a);

2. Award to Relator the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), the Federal False Claims Act, on the United States' recovery;

3. Award to Relator all reasonable expenses which the Court finds to have been neces-sarily incurred, plus reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1);

4. Judgment in favor of the State of California against all Defendants, by reason of the violations of the California False Claims Act as set forth above, in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a statutory civil penalty of not less than Five Thousand Dollars ($5,000) for each false claim, plus three times the amount of damages which the State of California has sustained, pursuant to the California False Claims Act;

5. Award to Relator of the maximum amount allowed pursuant to the California False Claims Act, on the State of California' recovery;

6. Award to Relator all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

7. Such other and further relief as the Court deems proper.

Dated:  July 29, 2013                          DANIEL R. BARTLEY
                                               BARTLEY LAW OFFICES

                                               ATTORNEYS FOR RELATOR
                                               SCOTT H. M. DRISCOLL, M.D.


                                               *s/Daniel Robert Bartley*
                                   By:         _____
                                               Daniel Robert Bartley

1

**DEMAND FOR JURY TRIAL**

2

Relator demands a jury trial, pursuant to FRCP 38.

3

Dated:  July 29, 2013                              DANIEL R. BARTLEY

4                                                   BARTLEY LAW OFFICES

5                                                   ATTORNEYS FOR RELATOR

6                                                   SCOTT H. M. DRISCOLL, M.D.

7                                       *s/Daniel Robert Bartley*

                                        By:   _____

8                                             Daniel Robert Bartley

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**PROOF OF SERVICE**

2

    I declare I am employed in the County of Marin, State of California, by Daniel Robert Bartley Law Offices, 4040 Civic Center Drive, Suite 200, San Rafael, CA, 94903-4184.  I certify that I am over the age of 18.

3

4

    I hereby certify that on today's date, I electronically filed the foregoing **"FIRST AMENDED COMPLAINT WITH DEMAND FOR JURY TRIAL"** with the Clerk of the United States District Court for the Eastern District of California by using the District Court's CM/ECF system.  I certify that all the counsel listed below are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

5

6

7

8

| Glen Dorgan, Assistant U.S. Attorney<br>United States Attorney's Office<br>2500 Tulare Street, Suite 4401<br>Fresno, CA 93721-1331<br>Te 559 497-4080<br>Email Glen.Dorgan@usdoj.gov | Elizabeth Voorhies<br>Deputy Attorney General<br>CA Attorney General's Office<br>1455 Frazee Road, Suite 315<br>San Diego, CA  92186-5266<br>Telephone: 619-688-7908<br>Email Elizabeth.Voorhies@doj.ca.gov |
|---|---|

9

10

11

12

    I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct and that this declaration was executed on this 29th day of July, 2013, in Hollister, San Benito County, California.

13

14

15

*s/Daniel Robert Bartley*

16

_____

Daniel Robert Bartley

17

18

19

20

21

22

23

24

25

26

27

28